THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR20-084 RSM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEVINARE PARKER'S |
| | ) | SENTENCING MEMORANDUM |
| DEVINARE ANTWAN PARKER, | ) | |
| Defendant. | ) | |
| | ) | |

Devinare Parker, through counsel, asks this Court to impose a sentence of time-served and three years of supervised release to include a lengthy placement at the RRC to provide additional structure and supervision for Devin.

In May of 2020, mass protests began after George Floyd was murdered by a white police officer. These protests directly confronted America's criminalization and fear of Blackness. People hoped and believed that protest would bring a much-needed "reckoning"—an acknowledgement and movement to change a system that continues to permit and sanction the murder of Black Americans by law enforcement, in which a Black American is 7 times more likely to be wrongfully convicted than a white American[1] and in which individual accountability is used as a rationale for perpetuating

---

[1] Gross, Samuel, et al, "Race and Wrongful Convictions in the United States," National Registry of Exonerations, September 2022 Report (identifying "preliminary investigative issues" in murder cases, "racial profiling" in sexual assault cases, and deliberate framing of predominantly Black defendants in drug cases as factors for wrongful convictions in the corresponding crime categories).

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker*, CR20-084 RSM.) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

the mass incarceration of Black Americans but is far less frequently invoked to punish those cloaked in uniform who abuse that power.

On May 31, 2020, Devinare Parker was a mentally ill, young Black man with no prior felony convictions living unhoused on the streets of Seattle. He was afraid of the police and he was afraid of the chaos and upheaval around him. He had recently been the victim of a crime and had lost direct access to his family in South Carolina—his only support network. While this was the first case in this district brought to federal court related to the George Floyd protests, it is not a protest case. Devin was not protesting; he was living on the streets of downtown Seattle. The protests and civil disorder came to him; he did not seek it out.

Imposing a significant custodial sentence here fails to acknowledge the facts of this case as they were that night. It would fail to account for the fact that the police who arrested Devin lied to make him seem more dangerous—a lie that could have led to far worse consequences for Devin and was repeated and publicized in charging documents, at detention hearings and by the United States Attorney in its own press release. A lengthy custodial sentence in this case would ignore the disparity in the sentencing range that the government's choice to federalize this case created. And, finally, imposing a lengthy custodial sentence on Devin fails to acknowledge the abhorrent state of mental health care in the federal prison system and the fact that each day Devin has served has been extreme punishment because of that catastrophe. There is no evidence or information supporting the government's contention that custody would stabilize his mental health care—in fact research and experience show the opposite.[2]

---

[2] *See* Ex. 3, Reingle Gonzalez, Jennifer and Connell, Nadine Connell, "Mental Health of Prisoners: identifying barriers to mental health treatment and medication continuity" AM J. PUBLIC HEALTH 2014 December; 104 (12): 2328-2333 (discussing substantial amount of the prison population lacking treatment for mental health and the causes, including budgetary issues within correctional facility, difficulty in transportation, and the "incarceration experience" itself as barriers to mental health treatment).

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The government spends much of its memo on Devin's failures on pretrial supervision. On the one hand, Devin's drug use and enmeshment with rap culture was more significant than previously known and he violated the trust and grace shown to him by Pretrial Services and Magistrate Judge Peterson. On the other hand, his music videos are just that – music videos in which props and actors were used. While the videos show he exercised extremely poor judgment while on pretrial supervision, many of the 120 videos represent only a few days—images are recycled and reused over and over again. The Court must keep in mind that he is being sentenced for an offense that took place in 2020 and the circumstances surrounding that offense.

Mr. Parker has spent a total of 91 days in custody since his arrest in this case. That has been sufficient punishment to achieve the sentencing goals of § 3553(a).

I.   **HISTORY AND CHARACTERISTICS OF DEVIN PARKER**

The Presentence Report (PSR) thoroughly and accurately describes Devinare Parker's background and characteristics.

A.   **Early Childhood and Adulthood**

Devin's happy and well-supported childhood is a stark reminder that mental illness is not something that can be controlled by external factors—no matter how resolute and positive those factors are. Ex. 1 at 1-2 (Support letter of Rene Nero discussing unwavering support of Devin). His mother and stepfather were, and continue to be, excellent parents. They balanced their travel and military lifestyle with warmth and involvement in their children's lives to ensure stability and family unity. Devin was a good student and graduated from high school. His parents encouraged their children to embrace values that they believed in—hard work and faith. Devin got his first job when he was 13 years old and took great pride in it.

The first signs of what would be later diagnosed as schizophrenia and bipolar disorder began while Devin was attending college. Ex. 2 (Milner Report) (filed under

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

seal) at 10-12 (noting different diagnoses). He had difficulty acclimating to college and his new peer groups and began experimenting with recreational drugs. The personality traits his family had considered "creative" and "quirky" were becoming more rigid and less charming.

After failing out of his first year of college, Devin tried taking classes, working full-time or part-time, and was in a number of failed romantic relationships. He did not yet have any mental health diagnoses. He and his family attributed his behavior and instability to the kinds of difficulties young people have in finding a satisfying life path. Devin would move to another state or city with a partner or a friend, quickly become homeless, fail out of another school, or be taken advantage of by acquaintances. PSR ¶¶ 44-46. He would then move back home and try to regroup. Some of these attempts were more successful than others.

But each time Devin returned home, his family would open their home and hearts to him, even if they could not understand many of his choices, his growing preoccupation with religious imagery (they were churchgoing, but not devout), or his inability to maintain stable employment, housing, or schooling.

## B.    Mental Health Crises and Diagnoses

In 2015, Devin suffered his first documented mental health crisis—though there had been clear signs of distress before then. PSR ¶ 46-47; Ex. 2 (filed under seal) at 4-5. His functioning rapidly deteriorated over a very short period—he was involuntarily committed to a hospital in Bellevue but was eventually released to his mother. PSR ¶ 49; Ex. 2 at 5. Once home with his family, he continued displaying signs of psychosis—regrouping did not seem possible any longer. He was diagnosed with paranoid schizophrenia and like most who are diagnosed with this illness, struggled with medication compliance and accepting his diagnosis.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker*, CR20-084 RSM.) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

In early 2017, Devin experienced his second severe mental health crisis, which resulted in his hospitalization for months that spring. PSR ¶ 51-56. He was again diagnosed as schizophrenic and his family applied for social security benefits based upon his mental health disability. Ex. 2 at 6. He was subsequently diagnosed as Depressive and Bipolar. *Id.* It was noted in his social security records that "[p]olicemen scare him because he was told not to return to work until he washed." Ex. 2 at 7.

From 2017 until July 2019, Devin moved back and forth between Washington and Kentucky. He went through periods of relative stability and periods of acute mental crisis. He was frequently homeless and often did not have a sustainable source of food or basic necessities. Throughout, his family remained loyal and supportive, but they had also grown to understand that their love and effort would not "cure" Devin, nor always keep him safe.

In July 2019, Devin moved to Portland. He began attending Community College in Portland for Computer Science. *See* Ex. 4 (Portland Community College Full Academic Records) (noting completion of "Winter 2020" semester with an "A" in Website Development and "B" in Computer Science). While there, he lived with his girlfriend, who described him as "one of the most respectful m[e]n I've ever met…[who] would not hurt a fly." Dkt. 23-1 at 6 (Letter to Court from Shaarvelle Muldrew) (filed under seal). He would travel to Seattle by bus, couch-surf with friends, and sell loose cigarettes in Pioneer Square to earn extra money. This is what he was doing when the pandemic hit Seattle in early 2020.

## II.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

On May 25, 2020, George Floyd was murdered. We were just a few months into the COVID-19 pandemic and people were isolated, scared, and starting to die in terrifying numbers. America's cities were on lockdown—institutions and social services were still trying to figure out how to reopen and provide services to those who

DEFENDANT'S SENTENCING MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

were rendered even more vulnerable by the pandemic, but unfortunately, most had not yet transitioned into "COVID-friendly" operations.

The day after George Floyd was murdered, the Minneapolis police department issued a press statement that cast Mr. Floyd as "resisting arrest" and stated the police officers "noted he appeared to be suffering medical distress."[3] The statement made no mention of the white uniformed Police Officer Derek Chauvin kneeling on Mr. Floyd's neck for nine and a half minutes[4] while other police officers held back bystanders who videotaped the murder and begged Chauvin to take his knee off of Mr. Floyd's neck.

Protests began that day. The majority were peaceful, but the media focus was on those that spiraled out of control. By May 31, 2020, then-president Donald Trump had referred to protestors as "terrorists" and suggested that law enforcement was prepared to "sic vicious dogs" and "ominous weapons" on them. Reports of police brutality were rampant in the press—weapons such as tear gas and rubber bullets were used by law enforcement against peaceful protestors. Reports of looting and property damage were also widespread—fires were started and property was vandalized. Communities and people were frightened.

### A.     May 31, 2020

Against this background, Devin Parker was living unhoused in the streets of downtown Seattle. His school in Portland had closed down due to the pandemic. He had attempted to check himself into a hospital there for mental health services but had been discharged. He couldn't get back home to his family in South Carolina and had been living in a park downtown, where his belongings had been stolen. Ex. 2 at 7.

---

[3] Bump, Philip, "How the First Statement from Minneapolis Police Made George Floyd's Murder Seem like George Floyd's Fault," THE WASHINGTON POST, April 20, 2021, avail at https://www.washingtonpost.com/politics/2021/04/20/how-first-statement-minneapolis-police-made-george-floyds-murder-seem-like-george-floyds-fault/
[4] Initial reports incorrectly noted this time as eight minutes and 46 seconds.

FEDERAL PUBLIC DEFENDER
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Shortly thereafter, Devin received a crude homemade slam gun for his own protection. Devin was not legally barred from possessing a firearm on May 31, 2020, but he would have been financially unable to afford to buy a typical and properly functioning firearm. The slam gun was made with what was likely $20-$50 worth of material. It is frankly hard to imagine how the crude device works without causing the "shooter" injury from the recoil; the firearm cannot be braced by a shoulder and each hand has to be used to hold separate parts – one hand holding the pipe with a pin, and the other hand sliding the larger pipe with the shell in the end.

Devin actively avoided watching the videos of George Floyd's murder, but remembers "being forced" to watch it by two men who were protesting and offered him food and water. He was spending his days in and around the downtown area and in the evenings he was sleeping on city buses. He was un-medicated, frightened, and had no access to any of his support systems, whether they be financial, familial, or institutional.

On May 31, 2020, the police encountered Devin. He was not participating in the protest. The unrest had surrounded him for days and he felt trapped and frightened. He was agitated, scared, and had witnessed violent behavior by both police officers and protestors. He felt abandoned by his family, who he imagined safely at home in South Carolina.

## B.    Devin's Arrest and Police Lies

At approximately 11:30 p.m., after the 5:00 p.m. city curfew, Devin was walking with a group of people down Third Avenue. A marked police vehicle was driving down the street at an extremely slow speed. As recordings show and Devin admits, he poured the last few drops of a beer onto the inside of the passenger side door of the police car and then dropped the empty can into the car as the vehicle was slowly driving past. Ex. 5 (Defense Investigative Memo). Because of this, the passenger side occupant of the vehicle, Sergeant Doug Raguso ordered the driver to stop so he could arrest Mr.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Parker.[5] Sgt. Raguso specifically told his partner that he wanted the report to note "felony assault" because "it was cheap beer." *Id.* As directed, his partner then lied to dispatch and noted a beer can was "thrown" at "Doug." There is no evidence of any contact between the beer can and the sergeant's body and, in fact, the video is clear that the can does *not* make contact with Raguso's face. *Id.*

The officers then placed Devin under arrest. They found the slam gun during a search incident to arrest and Devin's behavior began escalating. He was screaming and yelling—much of what he said was untrue. He lied that he had COVID and that he brought the slam gun to kill officers. He also continually asked to lined up "so [he] can start his pushups," suggested that the officers were going to inevitably kill him, yelled about his mixtape and asked to be "brought back to Harborview." All the while, he would intermittently calm down and respond respectfully and with deference to questions the officers ask him.

## III.   THE NEED FOR THE SENTENCE IMPOSED

### A.   The Seriousness of the Offense

Devin had a slam gun that was capable of expelling shotgun shells. He had it with him in a large crowd during a period of acute volatility, anguish and chaos. Neither he nor defense counsel intends to diminish the myriad of ways things could have gone wrong—not least of which could have been Devin being killed by police officers because he was a young Black man with a weapon in his possession. Despite the fact that Devin did not brandish or use the weapon, his possession of it is—nonetheless—serious.

---

[5] The PSR incorrectly states that the officer arrested Devin Parker because he was out after curfew. The defense admits that the officer had authority to arrest Devin Parker for that reason but it was not *the* reason for the arrest.

1    Devin made inflammatory statements and behaved in a frightening manner when

2    arrested. That behavior must be understood in the context of his preexisting fear of law

3    enforcement and his mental illness. As Dr. Milner opines:

> In addition, compounding Devin's fear or reaction regarding police, was
> the civil/political/social unrest and national fervor regarding the murder of
> a Black man at the hands of an officer, the demonstrations turned chaotic,
> and police response to the aforementioned. While in such a psychiatric
> state, any cognitive strengths would decline and any cognitive deficits
> would further deteriorate. Thus, Devin's ability to inhibit behavior, make
> good judgments, make good decisions or take in new information and
> process that information, would be deficient.

Ex. 2 at 11.

It is also important to point out that had Devin been able to afford to purchase a

commercially made firearm and carried it in his backpack on the night of May 31, 2020,

he would not have faced federal prosecution. In fact, if this had been any other night, it

is difficult to imagine he would have faced federal prosecution even for the slam gun he

possessed. He was not a felon and he was not subject to a domestic violence protection

order. If he had a handgun, there would have been no solid federal hook on which to

hang charges.

The defense never knows exactly how or why prosecutors decide to bring a state

case to federal court. But in this case, it is hard not to believe that this—the first

"protest" case brought by the government in this district—was federalized due to

extreme political pressure on prosecutors nationwide to charge protest cases and the lie

included in police reports and charging documents that Devin had thrown a "16-ounce

beer" at the head of an officer. The government's press release stated that "[t]his

defendant came to a protest armed with a device that could have proved fatal not only

to police, but to peaceful protestors in the area."[6] But, as later became clear, Devin did

---

[6] Department of Justice Press Release, "Former North Carolina Man Charged with
Possessing Destructive Device for Bringing Improvised Firearm to Protest," dated June

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker*, CR20-084 RSM.) - 9

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

not "go" to the protest, at all. The United States Attorney at the time was quoted using language that echoed the president, stating that the government would "use our federal authority where appropriate to remove such threats from our community, so that people can safely exercise their constitutional right to protest peacefully and honor the memory of George Floyd." *Id.* The government's press release *also* repeated the lie told by law enforcement that Mr. Parker "threw a 16-ounce can of Bud Light Ice through the passenger window striking one of the officers in the face." *Id.* Of course, this was false.

The government went on to federalize a number of other "protest" cases. Each and every one of them (that defense counsel is aware of) involved far more egregious conduct and protest-related crime: arson, extensive destruction of property, Molotov cocktails, or conduct such as stealing firearms from abandoned law enforcement vehicles.

### B.   Deterrence, Protection of the Public and Needed Treatment

Devin Parker falls into a Criminal History Category II. He has no prior felony convictions. His law enforcement contacts have been minimal and each can be tied to a specific mental health crisis, including the contact that led to the instant offense.

Neither general nor individual deterrence will be achieved through a lengthy prison sentence. What will deter this type of behavior in the future is supportive, structured, and well-resourced mental health institutions—something this Court cannot accomplish by sentencing Devin to more custodial time. Devin has a felony conviction and will be prohibited from possessing firearms in the future. He has spent more time in custody than ever before. He has now been deterred.

The same can be said for protection of the public. This Court will not protect the public by housing Devin in federal institutions unprepared and unwilling to treat his

---

10, 2020, avail at https://www.justice.gov/usao-wdwa/pr/former-north-carolina-man-charged-possessing-destructive-device-bringing-improvised (last accessed June 1, 2023).

DEFENDANT'S SENTENCING MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 10

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

mental illnesses.[7] While Devin's time on bond ended unsuccessfully, for much of it, he consistently attended his mental health appointments, even when his mental health medication compliance was not 100%. Devin did not always utilize these resources perfectly—but this will be a lifelong truth for Devin.

The government has highlighted ways in which Devin misused the stability and security he felt while on pretrial release, but there was also a lengthy period of time where Devin was gainfully employed, medicated, and attending his weekly counseling sessions. Devin was still occasionally testing positive for marijuana and was certainly still making music, but even the music videos posted during this time reflect a far more mellow and less postured musical persona—marijuana is shown and used in the videos, but that is the full extent of any illicit behavior as it is in 98% of the videos on the page. Luckily, the defense team also can show the Court what that looked like. Ex. 6 (physically filed under seal with the clerk of the court). He had created a life and a strict routine for himself. As the Court can see from the attached video exhibit, with the proper tools and surroundings, Devin is capable of maintaining a stable and healthy lifestyle despite his mental health challenges.

---

[7]*See* Thrush, Glenn "Short on Staff, Prisons Enlist Teachers and Case Managers as Guards," THE NEW YORK TIMES, May 1, 2023 (discussing continued staffing crisis at Bureau of Prisons facilities) avail. at https://www.nytimes.com/2023/05/01/us/politics/prison-guards-teachers-staff.html; Loller, Travis "Tenn. Inmate's Mutilation Highlights Prison Mental Care Woes" ABC NEWS, November 20, 2022 (highlighting egregious examples of consequences of untreated mental health issues in BOP and discussing 2016 DOJ study showing only 26% of federal inmates receiving needed mental health treatment) avail at https://abcnews.go.com/Health/wireStory/tenn-inmates-mutilation-highlights-prison-mental-care-woes-93669679; Pavlo, Walter "Federal Bureau of Prisons' Medical Care Falls Short of Its Own Policy," FORBES, April 19, 2022 (discussing 2022 audit of three BOP health contracts that outlined failure of BOP to adhere to its own stated policies and goals and lack of process to determine such failings) avail. at https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=331fa4d65eab.

DEFENDANT'S SENTENCING MEMORANDUM
(*U.S v. Parker*, CR20-084 RSM.) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### (1)    King County Mental Health Court

Because of how well Devin was doing for a year and a half, the government agreed that it would refer Devin to participate in the King County Mental Health Court—and did so. Unfortunately, this was a transition that Devin was incapable of making. His contact with this program began in early 2022. In April of 2022, the King County Mental Health Court closed out his referral.

Devin was unable to complete the intake process at that time as intense mental health symptoms began resurfacing. They were noticeable to his defense team and the social worker at the King County Mental Health Court. It appears that this was also the period in which he began creating and reposting more inflammatory music videos on his YouTube channel. He lost his steady job and sought out assistance for housing. He sporadically applied for other jobs but was rejected because of his arrest history.

Over the next few months, Devin's defense team focused on trying to reestablish mental health care and medication. Eventually, Devin recommitted to the idea of mental health court and the government renewed the referral. Things progressed because Devin was taking his mental health medication and had developed a positive and professional relationship with the social worker running the program.

But Devin did not stop testing positive for controlled substances. First, it was marijuana, as had been an issue for him in the past. It was made clear to Devin that he had to test negative for all substances in order to enter the program. After acknowledging that he was not able to control his drug use, he eventually entered into substance abuse treatment.[8] Despite treatment, he continued to use and in December of 2022, his referral to the King County Mental Health Court was again closed.

---

[8] This was an extremely burdensome and disruptive process. Devin was repeatedly told that his health care insurance would cover drug treatment at different facilities only to be rejected once he had completed an intake. The Federal Defender social worker accompanied Devin to multiple appointments attempting to advocate and clarify the process with varying success over an almost three month period.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

After his referral was closed out, Devin continued testing positive for marijuana and cocaine—a far more addictive narcotic than marijuana. Rather than reenrolling in school or trying to seek out other jobs, he focused on his creative pursuits, making music videos and creating his own music. This neither paid his bills nor did it provide the structure and routine in which he does best. After multiple attempts to address his drug use and multiple chances, Devin was remanded into custody on May 9, 2023.

### (2)   Stable Housing

Sentencing Devin to any further custodial time will serve none of the policy goals of § 3553(a), will not serve Devin, and will not serve society at large.

First, a primary trigger for Devin's mental health crises has always been being unhoused. Throughout his time on pretrial supervision, he has remained in stable housing because of the incredibly hard work and advocacy of the social workers at the Federal Defender's Office. However, as the Ninth Circuit acknowledged as recently as last month in an opinion related to a housing ordinance in the city of Seattle, the "prison to homelessness pipeline" has a disproportionate impact on Black men and "Seattle is no exception." *Chong Yim v. City of Seattle*, 63 F.4th 783, 787-789 (9th Cir. 2023) (citing the fact that "while Seattle is just 7% Black, Seattle's unhoused population is 25% Black") (internal citations omitted).

Devin will leave prison a first-time felon. The struggles he faces as a mentally ill young Black man navigating his life day to day will be exponentially more challenging with this conviction. Sentencing him to additional custodial time will further disrupt what will already be a difficult transition from custody back to the so-called real world, supervision, employment, and housing stability. Delaying this will not keep him or society safer.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### (3)    Co-occurring Substance Use Disorder

As his last few months on pretrial supervision have shown, Devin also needs targeted drug treatment that acknowledges the comorbidity among those with psychiatric disorders and substance disorders. *See generally* Hartwell, Karen, Toliver, Bryan, & Brady, Kathleen, *Biologic Commonalities between Mental Illness and Addiction*, 16 Prim. Psychiatry 33-39 (Aug. 1, 2009). A 2011 study showed that among Australian prison inmates, approximately half of those with severe mental illness also had a substance use disorder. Butler, Indig, Allnutt, & Mamoon, *Co-occurring Mental Illness and Substance Use Disorder Among Australian Prisoners*, 30 Drug & Alcohol Rev. 188–194 (Mar. 2011).

Admittedly, while Devin's legal team was focusing on the benefits of him being accepted into mental health court, it is likely that signs were missed of how acute his substance use was beginning to become. Because Devin presented as mentally stable and responsive to taking his prescribed medication, his escalating drug use initially seemed situational and manageable. However, it became clear to everyone, including Devin, that it was not. While Devin had previously used marijuana to cope with his anxiety—which is just one small piece of his mental health challenges—the type of drug use that he was engaged in prior to his remand was unusual and certainly needs comprehensive analysis and treatment.

Devin's remand into custody for his continued drug use has given him an opportunity to "dry out" and abstain from drugs. It has also impressed upon him the seriousness with which he must take his sobriety. Devin did well for a significant period of time when he was initially released on pretrial supervision until he started relapsing. His more recent term of custody has impressed upon him the importance of refraining from drug use.

Devin has shown the capacity for stable housing, compliance with mental health treatment, and abstinence from drugs other than marijuana. For more than a year and a half he achieved these goals and was proud of himself for doing so. Ex. 6. With access to resources, supervision and the wake-up call of having been in custody for another month before sentencing, he can undoubtedly achieve that again.

Consideration of Devin's specific vulnerability and experience in prison is also warranted. With limited access to any support networks, including his family, mental health support or counseling, Devin is extremely vulnerable in custody. His behavior—even when medicated—is quirky. His quick vacillations from childlike wonder to a blunt and honest affect put him at risk of misunderstandings and makes him a target for violence in prison. Custody is a far greater punishment for Devin than for other defendants.

## IV.   THE RAP VIDEOS DEMONSTRATE THAT DEVIN DID NOT TAKE SOBRIETY SERIOUSLY, BUT THE VIDEOS SHOULD NOT BE TAKEN AS PROOF OF CRIMINALITY.

The government has provided to the Court CDs and still shots from a select few of Devin's rap videos. Devin's interest in filming videos and making his own music has been known to the parties and Pretrial Services—he has music videos for songs called "Book Club" about making it through an entire book without quitting and "Parking Ticket" about trying to get a girl to pay his parking ticket. Although there are approximately 120 videos on the channel approximately 30 were made prior to Devin being arrested in this case. And the remainder clearly reflect only a week or two of filming days—at most. Most of the video clips are reused over and over in the videos—new content is rare and recycled videos are in most of the uploads.

The videos are, at first blush, upsetting because they demonstrate that Devin was cavalier about his drug use. That much the defense concedes. However, the Court should not be too quick to assume that Devin's rap music, which tends to glorify drugs

and toxic masculinity, imitates Devin's actual life. These are music videos, with props and friends being used to act out scenarios and scenes—not real life. This line of reasoning is so faulty that two state legislatures, New York and California, have explicitly limited its use in criminal trials.

In New York, the State Senate recently passed S7527, a law that would place heavy restrictions on the admission of a defendant's "creative expression" in the course of a criminal trial. In the justifications for the bill, the New York Senate explicitly mentioned prejudicial attitudes surrounding rap as a motivating factor for the legislation:

> Rap has come under scrutiny for decades, being blamed by the media for criminal activity, and admitted as evidence of criminal behavior by the artist. Social scientists have linked anti-rap attitudes and racially discriminatory behavior. But rap is just like any other creative expression.[9]

Clearly, the New York legislature was concerned that public attitudes about rap demonstrated a kind of racialized double standard that has no place in the courtroom.

The California State Legislature has taken similar steps in AB 2799, which also places restrictions on when "creative expression" like rap can be entered into evidence against a defendant. Like the New York Legislature, the California Assembly cited rap as the reason for the heightened scrutiny for creative expression and cited a "substantial body of research" that demonstrated "significant risk of unfair prejudice when rap lyrics are introduced into evidence."[10] This Court should also approach with intense skepticism the framing of Devin's rap music as anything more than a creative expression.

When Johnny Cash released a video of his performance of Folsom Prison Blues, nobody accused him of having violent tendencies because he sang, "I shot a man in

---

[9] https://www.nysenate.gov/legislation/bills/2021/s7527
[10] AB 2799 § 1(a).

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker*, CR20-084 RSM.) - 16

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Reno, just to watch him die." Neither should anyone assume that Devin actually wishes to live the lifestyle portrayed in the videos. However, the videos demonstrate a depth of Devin's drug use that was previously unknown and support the need for additional structure, counseling and treatment, none of which is meaningfully available in prison.

## V.     THE KINDS OF SENTENCES AVAILABLE

This Court has the ability to fashion a defendant-specific sentence for Devin Parker. Devin does not face a mandatory minimum sentence that binds the Court's hands and prevents the imposition of a sentence tailored to Devin's unique history and characteristics and criminal conduct.

The defense asks the Court to consider imposing a term of halfway house placement rather than custody. Such a placement would allow Devin to reengage with his mental health providers and medication management with only a month's disruption. It would allow him to seek out employment and, in turn, stable housing to release to upon its availability. It would allow him the freedom to have unrestricted communication with his family—who are integral to his support system and success. Ex. 1 (Support Letters).

## VI.    AVOIDING SENTENCING DISPARITIES

A time served sentence would avoid sentencing disparities. As noted above, Devin would be facing a range of one to three months if this case was charged in state court. Given the local nature of this offense, which did not involve gun trafficking or the use or display of the firearm, the state guidelines are a good measure of the seriousness of the offense.

The decision to federalize the charges against Devin led to a greatly inflated sentencing range. Before the case was brought to federal court, he was charged in King County with harassment and possession of a short barreled shotgun. *See* RCW 9.41.190(1)(a). If convicted of this Class C felony with a statutory maximum of five

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 17

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

years, Devin would have faced a mandatory guideline range of one to three months.[11]
See *2020 Washington State Adult Sentencing Guidelines Manual*, at 408.[12]

A review of cases in this District in which the defendant pled guilty to
possession of a destructive device show how unusual Devin's case is and makes it more
obvious that sentencing Devin to 12 or 27 months would create a disparity. Devin's
conduct and background are far more mitigating than cases in which defendants
received such a sentence or even less.

In *United States v. Vanek*, 13-cr-5663 (BHS), the defendant was sentenced to
only a 6-month sentence for possession of a destructive device despite being a career
offender with significant criminal history.

In *United States v Haupt*, 17-cr- 5225 (RBL), the defendant, who had significant
criminal history, agreed to place a lit bomb in the car outside of a witness' family's
home in exchange for methamphetamine. The bomb exploded but luckily only caused
significant property damage. The government asked for 36 months in custody and the
Court sentenced him to three years of probation.

In *United States v. Michlig*, 20-cr-185 (RSM), the defendant was in his forties
and had an old criminal record but restored his gun rights. He came to the government's
attention when he illegally purchased silencers from China. A subsequent search of his
home revealed an additional *ten* silencers, a gun safe with at least ten firearms, as well
as a fully automatic Uzi and a workshop full of chemical components to create grenades

---

[11] Devin has no prior felony criminal history; therefore his "Offender Score" would
have been zero with a range of one to three months.

[12] Avail. at
https://www.cfc.wa.gov/PublicationSentencing/SentencingManual/Adult_Sentencing_
Manual_2020.pdf

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker*, CR20-084 RSM.) - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

and other explosive devices. *Id.* at Dkt. 44. The government asked for 24 months, but the Court sentenced the defendant to only 12 months and 1 day.

Finally, in *United States v. Rice et al.*, 21-cr-180 (RAJ) two brothers, one of whom was diagnosed with significant mental health issues, made and threw four Molotov cocktails at an unoccupied coffee shop causing damage and leading the owners and neighbors to believe it had been a hate crime. One was sentenced to 7 months and the other to no custodial time.

## VII.    CONCLUSION

This Court is directed by statute to impose the minimum term necessary to achieve the goals of sentencing. This case is unusual for federal court: a mentally ill and scared homeless young Black man acquired a crude improvised firearm during a chaotic and frightening period of his life and our nation's history. Devin is not a violent person. He is 31 years old with very limited criminal history and a strong support system. A time-served sentence with a long period in the RRC is a just sentence that appropriately balances all of the relevant goals of sentencing.

DATED this 5th day of June, 2023.

Respectfully submitted,


s/ *Sara Brin*
s/ *Dennis Carroll*
Assistant Federal Public Defenders
Attorneys for Devinare Antwan Parker

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S v. Parker,* CR20-084 RSM.) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**